UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                    :
NIKKI WATSON-TOBAH,                                 :
                                                    :
                              Plaintiff,            :
                                                    :
              -v-                                   :
                                                    :
ROYAL MOVING & STORAGE, INC.                        :
et al.,                                             :
                                                    :
                              Defendants.           :
                                                    :
------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: DEC 0 5 2014

13-cv-7483 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On August 22, 2013, Nikki Watson-Tobah ("plaintiff" or "Watson-Tobah")

filed this action against Louis Da-Silva ("Da-Silva") and Royal Moving & Storage,

Inc.[1] ("Royal Moving," and collectively with Da-Silva, "defendants") to recover

damages for injuries allegedly sustained in a motor vehicle accident that occurred

on September 5, 2011 (the "September 5, 2011 accident"). (ECF No. 8 Ex. A.) On

October 22, 2013, defendants removed the action to this Court. (ECF No. 8.)

On September 30, 2014, defendants filed a motion for summary judgment on

the grounds that (1) the September 5, 2011 accident did not proximately cause

plaintiff's injuries and (2) plaintiff did not sustain "serious injury" as defined by

New York law. (See ECF Nos. 117, 120.) On October 7, 2014, the Court informed

the parties that it would grant defendants' motion for summary judgment and issue

---

[1] According to defendants' Answer, the correct name of the company is "Royal Moving & Storage
(Ottawa), Inc." (ECF No. 3.)

its decision in a separate order. (ECF No. 124.) This Opinion & Order sets forth the predicted order and rationale for the Court's decision.[2]

I.    BACKGROUND

A.    Plaintiff's Accident History

The September 5, 2011 accident—the accident at issue in this action—is only one in a series of workplace injuries, other car accidents, and claims for damages brought by the same plaintiff.

Plaintiff has worked as a police officer with the New York City Police Department since 1996. (Watson-Tobah Dep. 27:6-10, May 23, 2014, ECF No. 119 Ex. B.) As a police officer, plaintiff periodically encountered suspects who violently resisted arrest. Police records spanning a two-year period shortly after plaintiff began her employment—from 1997 to 1999—indicate that she was injury-prone and sustained injuries to her wrists, knees, left ankle, left shoulder, and left hand in the course of effectuating arrests. (See ECF No. 119 Exs. C, D, and E; see also Statement of Uncontested Material Facts in Support of Defendants' Motion for Summary Judgment Pursuant to Local Rule of Civil Procedure 56.1 ("Defs.' 56.1") ¶¶ 10-12, ECF No. 118.)

In addition to sustaining injuries in the course of performing her duties, plaintiff was involved and injured in three separate car accidents prior to her fourth accident, the September 5, 2011 accident, which forms the basis for her claims here.

---

[2] The Court notes that plaintiff failed to submit a 56.1 Statement, as required by Local Civil Rule 56.1. As a result, the statements in defendants' 56.1 Statement are deemed to be admitted for purposes of this motion. See Local Civil Rule 56.1(c). In any event, the Court finds that no rational juror could find in plaintiff's favor based on the evidentiary record before the Court.

2

(See Defs.' 56.1 ¶¶ 1-9, 13-30.) She described the first accident, the exact date of
which she could not remember at her deposition, as follows:

> I was coming home from work, I was at a light and a vehicle rammed
> into the back of me. They got out and they started pulling on my doors
> like to get me out of the car. . . . Then the guy jumped back in the car
> after he saw me calling for help. When he was trying to get away, his
> vehicle was locked onto my vehicle. . . . He couldn't get loose, so he was
> knocking me front and back, front and back, front and back. Finally he
> got loose. . . . He jumped out of the car and when I opened the door to
> get out of the car to go after him, I felt a lightning bolt like from my
> toes to the back of my head, like it just went boom. I started trembling
> and I just got back in the car.

(Watson-Tobah Dep. 10:8-11:17.) After this accident, plaintiff was transported to a

hospital by ambulance. (Id. 15:23-24.) She complained of pain; "[i]t hurt all over."

(Id. 16:15-20.) Her neck was placed in a brace. (Id. 17:3-4, 14-15.) Plaintiff

retained an attorney and received a settlement check. (See id. 18:10-11, 12-14.)

She could not remember the amount of the settlement at her deposition. (Id. 18:15-

17.)

On August 18, 2005, plaintiff was involved in another accident (the "2005

accident") while driving with a co-worker. The car in which plaintiff was riding was

rear-ended by another vehicle. (See Watson-Tobah Dep. 18:21-23 ("We were on the

Whitestone Expressway and a car flew into the back of us.").) Plaintiff was again

taken by ambulance to an emergency room. (Id. 19:12-21.) Plaintiff testified that,

again, "[e]verything hurt" after the 2005 accident. (Id. 20:5-8.) Her treatment in

the emergency room consisted of pain medication. (Id. 19:22-20:2.) She missed over

thirty days of work. (Id. 21:3-4.)

Plaintiff concedes that she injured her neck and back in the 2005 accident. (Plaintiff's Answers to Interrogatories ¶ 13 (stating that plaintiff sustained "[m]id-back, neck and back sprain and strain from motor vehicle accident in August 2005"), ECF No. 119 Ex. A; see also Watson-Tobah Dep. 47:4-7, 20-23.)  The day after the 2005 accident, plaintiff visited Dr. Melvin Samuels ("Samuels") of Alex Roit Chiropractic, PC, and complained of "constant chest and neck pain" and "constant mid-back and lower back pain."  (ECF No. 119 Ex. H at 1.)  Samuels' diagnostic impression was as follows:

> 1. Status Post-Traumatic Cervical Subluxation (739.1)
> 2. Status Post-Traumatic Thoracic Subluxation (739.2)
> 3. Status Post-Traumatic Lumbar Subluxation (739.3)
> 4. Status Post-Traumatic Cervical Neuritis (723.4)
> 5. Status Post-Traumatic Cervical Myofacitis (723.1)
> 6. Status Post-Traumatic Thoracic Sprain (847.1)
> 7. Status Post-Traumatic Lumbar Neuritis (724.4)
> 8. Status Post-Traumatic Lumbar Myofacitis (724.2)

(Id. at 3.)

Ten days later, on August 29, 2005, plaintiff visited another doctor—Dr. Lev Bentsianov ("Bentsianov") of L&B Medical P.C. ("L&B")—and reported "headaches, dizziness, [and] pain in the neck radiating to bilateral shoulders."  (ECF No. 119 Ex. I at 1.)  Plaintiff also reported "numbness, tingling, paresthesias, weakness around her bilateral shoulders," as well as "constant and transient persisting middle and lower back pain."  (Id.)  Bentsianov's diagnostic impression was as follows:

> Sprain in cervical paraspinal muscles and ligaments (847.0)
> Sprain in lumbosacral paraspinal muscles and ligaments (846.0)
> Fibromyalgia (729.1)
> Myositis (729.7)
> [Rule out] Cervical radiculopathy (723.4)

4

> [Rule out] Lumbosacral radiculopathy (724.4)
> Posttraumatic stress syndrome (308.9)

(Id. at 4.)[3]

On October 5, 2005, plaintiff underwent an initial physical consultation with

Dr. Dale Alexander ("Alexander") of L&B, who documented plaintiff's complaints as

follows:

> **Neck pain**—radiating to the upper extremities. The patient denies
> numbness and tingling sensation in the upper extremities. The
> patient states that she reports having feeling of "spasm" upon
> awakening and at the end of the day.
> Pain—intermittent, dull, is aggravated by abrupt turning of the head
> forward, backward, side to side: relieved by physical therapy and
> medications. The patient rates her neck pain as 5 on a pain scale 1-10.
>
> **Lower back pain** radiating to the left lateral thigh and to the left
> knee. The patient feels numbness in the left lower extremity.
> Pain is constant, burning, is exacerbated by bending, and is relieved by
> medications. The patient rates her low back pain as 8 on a pain scale
> 1-10.

(ECF No. 119 Ex. F at 1.) Plaintiff "reported sustaining injuries to the cervical and

lumbar spine" in the 2005 accident. (Id.) Plaintiff also complained that "she

developed neck and low back pain" "immediately" after the 2005 accident. (Id.)

Alexander diagnosed plaintiff with "Cervical and Lumbar muscles Posttraumatic

sprain syndrome" (id. at 6) and developed a treatment plan that included

medications for pain control and physical therapy (id. at 7).

On January 6, 2006, almost five months after the 2005 accident, plaintiff

again visited Bentsianov and reported "headaches, dizziness; pain in the neck

---

[3] Bentsianov's final diagnosis was the same as his initial impression. (See ECF No. 119 Ex. J at 4.)

radiating to bilateral shoulders; [and] constant persisting lower back pain." (ECF

No. 119 Ex. J at 1.) Bentsianov noted the following in his report:

> Ms. Nikki, Tobah-Watson has received a severe trauma to her head,
> cervical and lumbar spines, right and left shoulders. This causes
> vertebrae to be misaligned, ligaments and muscles to be over-
> stretched, nerves to be irritated and various soft tissues to be inflamed.
> Injuries of this nature and the body's responses to them can go on for
> years.
> . . .
> It is my opinion that as a direct result of the traumatic injuries
> sustained by Ms. Nikki Tobah-Watson in the accident of 08/18/2005
> there are extremes of joint movement with concomitant over-stretching
> and tearing of the supporting structures of the cervical and lumbar
> spines. The residual sequelae and limitations of functions that
> resulted constitute a permanent, partial impairment and preclude the
> possibility to complete restoration.

(Id. at 5-6.) At some point following the 2005 accident, plaintiff retained the same

law firm that had represented her in connection with the first car accident; that

firm, again, successfully negotiated a settlement. (See Watson-Tobah Dep. 20:22-

23, 21:23-24.)

On October 17, 2010, plaintiff was involved in yet a third motor vehicle

accident (the "2010 accident"); this accident also resulted in injury to her back and

neck. (Defs.' 56.1 ¶ 28.) She was seen in an emergency room three days after the

accident. (Id. ¶ 29.) A medical report dated October 25, 2010 indicates that

plaintiff was told she had a concussion and that she complained of a backache and a

headache. (Id. ¶ 30.) Plaintiff's attorney describes the third accident as follows in

his sworn affirmation:

> In the accident of October 17, 2010 Tobah was seated as a passenger in
> the rear of a vehicle that was struck by another vehicle. Tobah hit
> "banged head on side door." . . . She denied loss of consciousness and

6

no abrasions were noted. The doctors were clearly only concerned with head trauma, especially since she complained of vomiting four times that day.

(Affirmation in Opposition to Defendants' Motion for Summary Judgment ("Wallace Aff.") ¶ 28, ECF No. 121.)

The accident at issue here occurred less than a year after the 2010 accident. On September 5, 2011, a tractor-trailer driven by Da-Silva and owned by Royal Moving backed into plaintiff's car while waiting in line at a tollbooth on the Throgs Neck Bridge in the Bronx. The accident was partly captured on video. The video shows a tractor-trailer slowly backing up while waiting in line at a tollbooth. The trailer bumps into plaintiff's car. Any rational juror watching this video would conclude that the trailer stopped as soon as it touched plaintiff's car and that the trailer's contact with the car could only be characterized as minimal. After the trailer stops, the driver exits, walks to the rear of the trailer, returns, and drives through the tollbooth. Plaintiff's car follows. Plaintiff is visibly angry as she drives through the tollbooth: her mouth is moving quickly and her arm is protruding from the car window. Plaintiff's car does not have any visible damage.

Almost two years later, on August 22, 2013, plaintiff filed this action in the New York State Supreme Court, Bronx County, to recover damages for "serious" injuries she allegedly sustained in her fourth car accident, on September 5, 2011. (ECF No. 8 Ex. A.) Plaintiff's claimed injures are the same as those she concedes she also sustained in connection with other car accidents and some of her work-related incidents, namely a concussion and injuries to her neck, back, and left

7

shoulder; she also alleges that she injured her right knee.[4] (See Plaintiff's Answers to Interrogatories ¶ 9.)

## B. Plaintiff's Treating Physicians

Plaintiff was transported to Jacobi Medical Center on September 5, 2011. Plaintiff then was treated by Drs. Rafael Abramov ("Abramov") and Gautam Khakhar ("Khakhar") of Physical Medicine and Rehabilitation of New York.[5] Plaintiff first visited Abramov on September 8, 2011.[6] Plaintiff reported "head trauma to the left side from the door frame" and complained of frontal headaches, "severe" neck pain, as well as pain in her low back, right knee, and left shoulder. Abramov's "initial physiatric evaluation" notes that plaintiff had sustained a back injury in a 2005 car accident and that "the back pain was treated with the conservative treatment of physical therapy and her symptoms improved." The evaluation does not mention plaintiff's prior workplace injuries or the first and more recent third car accidents. After describing the results of physical and neurological examinations, the evaluation sets forth the following "impression":

> The patient is a 44-year-old female status post motor vehicle accident on September 5, 2011 with injuries to the cervical spine, lumbar spine, left shoulder, right knee, with frontal headaches as well as anxiety and nervousness and sleep disturbance.

---

[4] This list is a summary of the alleged injuries. For a more detailed list, see Plaintiff's Answers to Interrogatories ¶ 9.

[5] The pretrial submissions in this case also included reports by Dr. Peter C. Kwan ("Kwan"). The Court does not discuss Kwan's reports here because plaintiff does not cite them in her opposition to this motion.

[6] In her opposition brief, plaintiff indicates that "[t]he medical records of Rafael Abramov and Physical Medicine and Rehabilitation of New York are annexed as exhibit 'C.'" (Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp.") at 7, ECF No. 122.) Exhibit C to plaintiff's opposition, however, does not contain any reports by Abramov. The Court assumes this was inadvertent error and relies on the records it has received as part of the pretrial submissions in this case.

The evaluation also states that plaintiff was "incapacitated from work" and concludes with a causation opinion:

> CAUSALITY:
> If the above statements are true and accurate, causality is established between the above stated accident and today's pathological findings.

The evaluation does not specify which "above statements" must be "true and accurate" and does not contain any analysis to support the opinion that plaintiff's injuries were caused by the September 5, 2011 accident rather than some combination of plaintiff's prior altercations and accidents. Indeed, the use of the word "if" suggests a lack of a reasonable degree of medical certainty as to causality.

According to plaintiff, she "was treated by Abramov until November 2011 when her No Fault Insurance was denied for any future treatment." (Pl.'s Opp. at 8.) On November 10, 2011, Abramov issued a "follow up physiatric evaluation" which describes the results of various MRIs and another physical evaluation. Abramov's assessment was as follows:

> The patient is a 44-year-old female status post motor vehicle accident on September 5, 2011 with cervical and lumbar myofascial derangement, cervical and lumbar disc bulges and disc herniation with possible radiculopathies, left shoulder impingement, right knee internal derangement and contusion, frontal headaches, and initial anxiety.

The "follow up physiatric evaluation" also states that "[t]he patient is working with partial disability." Unlike the "initial physiatric evaluation," this evaluation does not contain any statement that any of plaintiff's injuries were caused by the September 5, 2011 accident; it also does not distinguish between

9

longstanding symptoms and those appearing for the first time after the September 5, 2011 accident (if any).

Based on the record before the Court, plaintiff did not seek medical treatment for her allegedly "serious" injuries for two years. Then, only after she filed this lawsuit, she consulted Khakhar. Khakhar's "followup physiatric evaluation,"[7] dated November 20, 2013, notes that plaintiff complained of "[n]eck pain radiating to the left upper extremity with weakness and sensory disturbances," "[l]ow back pain radiating to the right lower extremity with weakness," and "[l]eft shoulder pain." The evaluation also discusses the results of a physical examination. Notably, the evaluation states that plaintiff's right knee was "[n]ontender and pain free" with "[f]ull range of motion." Khakhar's assessment was as follows:

> A 46-year-old woman status post motor vehicle accident on September 5, 2011, with cervical and lumbar myofascial derangement, cervical and lumbar disc bulges and disc herniations, left shoulder tendinopathy, and right knee internal derangement that is currently asymptomatic.

The report does not contain any opinion as to the cause or causes of these injuries, and it does not suggest any awareness of plaintiff's prior injury and symptom history.

C.     Plaintiff's Expert Reports

Whether the September 5, 2011 accident caused plaintiff's alleged injuries, and whether these injures (versus other injuries she previously sustained) were

---

[7] Plaintiff does not discuss her treatment with Khakhar in her opposition brief, but plaintiff's attorney mentions Khakhar's findings in his affirmation. (See Wallace Aff. ¶ 16.) As Khakhar's reports are not attached to plaintiff's motion papers, the Court relies on the records it has received as part of the pretrial submissions in this case, and as effectively incorporated by reference in counsel's affirmation.

"serious" under New York law are the two key legal issues on this motion. Plaintiff has offered two statements by a proposed expert medical witness, Dr. Arden Kaisman ("Kaisman") in support of her position. Kaisman's statements are designated as an "initial evaluation" and a "narrative report." (See ECF No. 64.) Both reports were prepared after plaintiff had already commenced this lawsuit, therefore necessarily over two years after the September 5, 2011 accident itself. Plaintiff has not produced any other expert report on the Court-ordered schedule.[8]

Kaisman's "initial evaluation" is a one-and-a-half-page document dated December 19, 2013. (See ECF No. 64.) The evaluation describes plaintiff's past medical history solely as "[s]ignificant for hypertension for which she is on atenolol."[9] No mention is made of the injuries plaintiff had sustained in connection with her work (which she continued to perform) or in prior accidents. After noting plaintiff's complaints of "low back pain radiating to her left lower extremity with numbness and tingling," the evaluation states that a September 10, 2011 MRI "showed L4-L5 and L5-S1 broad-based subligamentous disc herniation as well as diffuse disc bulge at L3-L4." The evaluation then reports the results of Kaisman's physical examination of plaintiff's lumbar spine as follows:

---

[8] Per the Court's Scheduling Order, expert reports were due July 2, 2014. (ECF No. 7.) On that day, plaintiff requested a one-week extension of the time to serve her expert report. (ECF No. 37.) The Court granted the request. (ECF No. 39.) On July 9, 2014, plaintiff served Kaisman's reports.

On September 6, 2014, plaintiff served a "preliminary" "biochemical" expert report on defendants via e-mail. (See Memorandum of Law in Support of the Defendants' Motion to Preclude the Admission of the Plaintiff's Proposed Biochemical Expert, Dr. Pamela McCauley and Bar Her Testimony at Trial at 2-3, ECF No. 95.) This report was served almost two months after the (extended) July 9, 2014 deadline elapsed and over a month after the Court denied plaintiff's request to serve supplemental expert reports, as further explained below. (ECF No. 83.) Accordingly, the Court does not accept this untimely report and does not consider it a part of the record on this motion.

[9] The initial evaluation also states that plaintiff had undergone a hysterectomy.

11

Physical examination of the lumbar spine reveals that forward flexion is to 40 degrees (normal is to 90 degrees). Lumbar spine extension is to 30 degrees (normal is to 40 degrees). Right and left lateral bending are to 30 degrees (normal is to 40 degrees). Right and left lateral rotation are to 40 degrees (normal is to 80 degrees). There is normal motor strength in the lower extremities except for EHL strength, which is slightly decreased on the left as compared to the right. There is decreased sensation in the left L5 and S1 distributions to pinprick, touch and cold.

Straight leg raise is positive on the left at 40 degrees and on the right at 50 degrees with left-sided low back pain. Patellar reflexes are equivalent. Achilles tendon reflexes are slightly decreased on the left as compared to the right. Palpation of the lumbar spine reveals pain and spasm on the left at the L2 through S1 levels.

The evaluation states that "[r]ange of motion was done with a goniometer" and Kaisman's "hand on the patient's spine," but does not explain how Kaisman arrived at the various degrees of restriction above. Specifically, the evaluation does not specify who controlled the movements during the range-of-motion tests—that is, whether (1) Watson-Tobah was asked to move in various directions and indicate when further movement became restricted or painful, or (2) Kaisman moved her body until the motion became restricted or pain was created. The evaluation also lacks any comparison to plaintiff's range of motion prior to September 5, 2011.

The evaluation then states:

ASSESSMENT:

1.  BULGING DISCS AT L3-L4 AND HERNIATED DISC AT L4-L5 AND L5-S1 WITH LUMBAR RADICULOPATHY AND MYOFASCIAL PAIN SYNDROME.

The evaluation then makes the conclusory legal statement:

**These injuries are causally related to the motor vehicle accident of September 5, 2011.**

12

The evaluation concludes with a five-step "PLAN." [10]

Kaisman's "narrative report" is a two-and-a-half-page document dated July 3, 2014. In addition to reiterating the information contained in the initial evaluation, the narrative report notes that a second MRI of the lumbar spine "was performed on January 23, 2013, which showed an L4-L5 midline disc herniation with a disc bulge at the L3-L4 level." The report also notes that, on February 12, 2014, Watson-Tobah underwent a "percutaneous lumbar discectomy at the L4-L5 level" and contains a one-paragraph summary of Kaisman's second physical examination of her lumbar spine.[11] The report then, again, contains the following conclusory language:

> ASSESSMENT:
>
> 1.   MS. WATSON-TOBAH SUFFERED FROM A BULGING DISC AT L3-L4 AND HERNIATED DISC AT THE L4-L5 LEVEL, WHICH WERE CAUSALLY RELATED TO THE MOTOR VEHICLE ACCIDENT OF SEPTEMBER 5, 2011.
>
> To date, the patient has had significant therapy and continues to undergo therapy for her back pain. She has undergone a percutaneous lumbar discectomy at the L4-L5 level, but yet remains symptomatic. A permanent disability is present to the lumbar spine.

The report does not reference what type and duration of "significant therapy" plaintiff had received, and when such therapy started. It does not describe what the word "disability" means and whether it affects life activities of any kind.

---

[10] The initial evaluation is followed by a half-page note dated January 23, 2014. The note describes the results of a second MRI (which are also reported in the narrative report) and recites that Kaisman discussed with Watson-Tobah the "risks, benefits and alternatives of percutaneous lumbar discectomy at the L4-L5 level."

[11] This summary is similar to the summary that appears in the initial evaluation.

Neither of Kaisman's reports refers to plaintiff's preexisting injuries or contains any analysis to support the conclusion that the described injuries were caused by the September 5, 2011 accident. The reports do not mention that plaintiff is employed as a police officer and has sustained multiple injuries while effectuating arrests. Indeed, while the police records before this Court span only a two-year period, plaintiff has been employed as a police officer for almost twenty years and may have sustained further work-related injuries. Kaisman's reports also do not mention that, prior to the September 5, 2011 accident, plaintiff had been involved in three car accidents, in which she sustained extensive injuries to her neck, back, and shoulders. In particular, the reports make no reference to the 2005 accident, after which plaintiff complained of "constant mid-back and lower back pain" (ECF No. 119 Ex. H at 1), "reported sustaining injuries to the cervical and lumbar spine" (id. Ex. F at 1), and was diagnosed with "[c]ervical and [l]umbar muscles [p]osttraumatic sprain syndrome" (id. at 6). The reports also do not mention, much less address, Bentsianov's conclusion that the injuries plaintiff had sustained in the 2005 accident "can go on for years" and "constitute a permanent, partial impairment and preclude the possibility to complete restoration." (Id. Ex. J at 5-6.) In short, the opinion in the reports that plaintiff's injuries were caused by the September 5, 2011 accident is nothing more than an unsupported legal conclusion.

D.     Developments in this Action

Between July 11, 2014 and July 16, 2014, defendants filed several motions in limine. (ECF Nos. 43, 47, 52, 57.) At the final pretrial conference ("FPTC") held on July 17, 2014, the Court ruled on the motions in limine on the record. The Court

precluded Kaisman, as well as plaintiff's treating physicians, from opining that plaintiff's alleged injuries were causally related to the September 5, 2011 accident. (See 07/17/14 Tr. at 7, 9-10, 12-13, 38, ECF No. 86.)[12]  The Court's decision was based on the fact that none of the doctors had performed a differential or any other scientific analysis to eliminate other known (to plaintiff) and possible causal factors of plaintiff's alleged injuries, such as prior accidents, physical altercations on the job, or even the process of physical therapy.  (See 07/17/14 Tr. at 7, 10, 12-13, 38.)

On July 24, 2014, defendants requested an adjournment of the July 28, 2014 trial date in light of untimely production of potentially relevant medical records. (ECF No. 71.)  Defendant had—for the first time—learned of plaintiff's history of workplace injuries.  The Court adjourned the trial date to October 6, 2014 and allowed the parties to exchange supplemental reports dealing solely with the newly produced medical records.  (ECF No. 83.)  The Court denied plaintiff's request to serve supplemental expert reports on other issues.

On September 23, 2014, defendants requested an extension of time to file dispositive motions based on the Court's July 17, 2014 rulings.  (ECF No. 103.)  The Court granted the request.  (ECF No. 112.)  On September 30, 2014, defendants filed a motion for summary judgment on the grounds that, based on the evidence, no rational juror could conclude that (1) the September 5, 2011 accident proximately caused plaintiff's injuries or that (2) plaintiff sustained "serious injury" as defined

---

[12] The Court did not preclude the doctors from testifying about their observations and diagnoses as plaintiff's treating physicians.  (See 7/17/14 Tr. at 14, 38.)

by New York law.  (See Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") at 4, ECF No. 120.)

On October 7, 2014, plaintiff opposed defendants' motion.  (ECF No. 122.)  In support of her opposition, plaintiff submitted a sworn affidavit, dated October 6, 2014, describing her impairments during the first six months after the September 5, 2011 accident.  (Affidavit in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Aff.") ¶¶ 5-6, ECF No. 123.)  The affidavit states that plaintiff's ability to drive, complete simple household chores, and engage in recreational activities were limited for six months after the September 5, 2011 accident.  (See id.)  The affidavit also states that plaintiff was unable to work for approximately one month after the accident "due to injuries sustained including injuries to [her] low back."[13]  (Id. ¶ 4.)

Plaintiff acknowledges in her affidavit that she sustained injuries in the 2005 accident and that she was "treated for injuries sustained in that accident until on or about December 17, 2005."  (Id. ¶ 7.)  The affidavit also states that plaintiff "missed approximately one month of work due to injuries sustained in that accident."  (Id.)  However, the affidavit states that plaintiff "did not miss any work from October 2005 through September 11, 2011" and "did not seek medical treatment for any injury to [her] low back from [the 2005 accident] from December 17, 2005 through September 5, 2011."  (Id.)  The affidavit refers to an "unremarkable" MRI from 2005.  (Id.)  The affidavit does not mention that, in addition to the 2005 accident,

---

[13] According to the affidavit, plaintiff returned to work in a limited capacity on October 6, 2011 and began working in a regular capacity on November 19, 2011.  (Pl.'s Aff. ¶ 4.)  Plaintiff did not work from February 12, 2014 to March 12, 2014 due to her surgery.  (Id.)

plaintiff had been involved in two other car accidents and had sustained work-related injuries during the course of her career as a police officer.

Defendants' motion for summary judgment is the subject of this Opinion & Order.

II.   LEGAL STANDARDS

A.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995) (citations omitted).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party is not required to offer affirmative evidence negating the opposing party's case. Id. It may meet its burden by showing that there is insufficient evidence in the record for a rational trier of fact to find for the nonmoving party. See id. at 325 ("[T]he burden on the moving party may be

discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."); see also id. at 322-23 ("[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) ("While whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.'" (quoting Celotex, 477 U.S. at 323)).

Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." Anderson, 477 U.S. at 256.  He or she "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v.

Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation mark omitted); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Self-serving affidavits that conflict with the nonmoving party's earlier deposition testimony are insufficient to defeat summary judgment.  See Benamati v. McSkimming, 777 N.Y.S.2d 822, 824 (N.Y. App. Div. 2004).  "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 141 (2d Cir. 2012) (quoting Matsushita, 475 U.S. at 587).

B.    New York's No-Fault Law

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (the "No-Fault Law"), "[e]very car owner must carry automobile insurance, which will compensate injured parties for 'basic economic loss' occasioned by the use or operation of that vehicle in New York State, irrespective of fault."  Pommells v. Perez, 4 N.Y.3d 566, 571 (N.Y. 2005) (citing N.Y. Ins. Law §§ 5102(a), 5103).  A party can only initiate a negligence action to recover noneconomic loss in the case of a "serious injury."  See N.Y. Ins. Law § 5104(a).  The purpose of the No-Fault Law is to "weed out frivolous claims and limit recovery to significant injuries."  Gualtieri v. Farina, 283 F. Supp. 2d 917, 920 (S.D.N.Y. 2003) (quoting Bewry v. Colonial Freight Sys., No. 01 CIV. 5634 (JCF), 2002 WL 31834434, at *2 (S.D.N.Y. Dec. 17, 2002)) (internal quotation marks omitted).

The No-Fault Law identifies nine types of "serious injuries":

> [1] death; [2] dismemberment; [3] significant disfigurement; [4] a fracture; [5] loss of a fetus; [6] permanent loss of use of a body organ, member, function or system; [7] permanent consequential limitation of use of a body organ or member; [8] significant limitation of use of a body function or system; or [9] a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

A plaintiff may not rely exclusively on subjective complaints as evidence of a "serious injury," and must offer some form of objective proof of a physiological injury. See Tuna v. Babendererde, 819 N.Y.S.2d 613, 615 (N.Y. App. Div. 2006) (citations omitted). "[B]ulging or herniated discs are not, in and of themselves, evidence of serious injury without competent objective evidence of the limitations and duration of the disc injury." DeJesus v. Paulino, 61 A.D.3d 605, 608 (N.Y. App. Div. 2009) (citations omitted); see also Pommells, 4 N.Y.3d at 574.

To prove a serious injury based on a significant limitation of use of a body function or system, a plaintiff must show that "she suffered from 'something more than a . . . minor, mild or slight limitation of use.'" Ventra v. United States, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2000) (quoting Licari v. Elliott, 441 N.E.2d 1088, 1091 (N.Y. 1982)). "The significance of the limitation must be supported by credible medical evidence and must be objectively measured and quantified. Subjective complaints of pain, unsupported by credible medical evidence, cannot form the basis of a significant limitation." Id. at 333-34 (citations omitted).

To establish a significant limitation based on results of range-of-motion tests, a plaintiff must submit medical affidavits that both quantify the results of the tests and specify the objective tests that were performed.[14] See Palasek v. Misita, 734 N.Y.S.2d 587, 588 (N.Y. App. Div. 2001) (affirming summary judgment for the defendant where, inter alia, the affidavit from the plaintiff's examining physician "failed to set forth the objective medical tests performed . . . to determine that the plaintiff suffered specifically-quantified restrictions of motion in her neck and back" (citations omitted)); see also Williams v. Ritchie, 139 F. Supp. 2d 330, 340 (E.D.N.Y. 2001) ("[A] medical affidavit specifying 'the degree of restriction of movement suffered' and 'the objective tests performed to determine such restriction of movement' is generally satisfactory" to prove a "significant limitation." (emphasis added) (citations omitted)).

To demonstrate a "permanent loss of use of a body organ, member, function or system," a plaintiff must show that he or she has experienced a "total" loss of use of some body part or bodily function. See Oberly v. Bangs Ambulance, Inc., 751 N.E.2d 457, 458 (N.Y. 2001). "A mere limitation of use is insufficient." Ruffin v. Rana, No. 11 CV. 5406(MHD), 2013 WL 4834368, at *12 (S.D.N.Y. Sept. 4, 2013) (quoting Sanchez v. Travelers Cos., 658 F. Supp. 2d 499, 508 (W.D.N.Y. 2009)) (internal quotation marks omitted). "In contrast, to show a 'permanent

---

[14] There are two types of range of motion tests: passive and active. "In performing active range of motion tests, the patient is asked to move the body part at issue in various directions and is asked to indicate when further movement becomes restricted or painful. In the passive range of motion test, the examiner moves the injured body part until the motion is restricted or pain is created." Hodder v. United States, 328 F. Supp. 2d 335, 355 (E.D.N.Y. 2004). "The results of the passive test are "based upon more objective criteria . . . because the doctor controls the movements." Id. (citation omitted).

consequential limitation of use of a body organ or member,' plaintiff must present evidence that she has suffered a permanent limitation that, though not total, is of sufficient severity to be deemed consequential in comparison to her prior non-injured condition." Id. (citations omitted).

Whether the evidence would warrant a jury finding that a plaintiff's injury qualifies as a "serious injury" is a threshold legal question for the court to decide. See Licari, 441 N.E.2d at 1091. With respect to motions for summary judgment under the "serious injury" provisions of the No–Fault Law, the following burden-shifting scheme applies:

> on summary judgment, a defendant must establish a prima facie case that plaintiff did not sustain a "serious injury" within the meaning of Insurance Law § 5102(d). In support of its argument that there is no such serious injury, defendant may rely on the unsworn reports by plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits. Once a defendant's burden is met, the plaintiff is then required to establish a prima facie case that he sustained a serious injury. For plaintiff to defeat a summary judgment motion, admissible evidence must be presented in the form of sworn affidavits by physicians.

Barth v. Harris, No. 00 Civ. 1658(CM), 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001) (citations omitted).

C.    Negligence

"To establish a prima facie case of negligence under New York law, three elements must be demonstrated: (1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." Curley v. AMR

Corp., 153 F.3d 5, 13 (2d Cir. 1998) (citations omitted).[15] "In order to recover damages for noneconomic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, nonconclusory expert evidence sufficient to support a finding, not only that the alleged injury is 'serious' within the meaning of Insurance Law § 5102(d), but also that the injury was proximately caused by the accident at issue." Carter v. Full Serv., Inc., 29 A.D.3d 342, 344 (N.Y. App. Div. 2006) (emphasis added) (citations omitted). "Plaintiff's own self-serving and conclusory testimony" regarding causation is, "in the absence of corroborating objective medical evidence, insufficient to raise a triable issue for submission to the jury." Id. at 344-45 (citations omitted); cf. Barnes v. Anderson, 202 F.3d 150, 159 (2d Cir. 1999) ("[E]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (citations omitted)); Gold v. Dalkon Shield Claimants Trust, No. B-82-383 (EBB), 1998 WL 351456, at *3 (D. Conn. June 15, 1998), aff'd, 189 F.3d 460 (2d Cir. 1999).

"[E]ven where there is objective medical proof [of injury], when additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a gap in treatment, an intervening medical problem or a preexisting condition—summary dismissal of the complaint may be appropriate." Pommells, 4 N.Y.3d at 572. "With respect to pre-existing injuries, a defendant moving for summary judgment is required to submit 'persuasive evidence' as to the

---

[15] Here, defendants have stipulated to a breach of a cognizable duty. (Defs.' Mem. at 4.)

existence of the plaintiff's pre-existing injuries." <u>Evans v. United States</u>, 978 F. Supp. 2d 148, 164 (E.D.N.Y. 2013) (citations omitted).  If the defendant meets this burden, "the burden shifts to the [p]laintiff to 'come forward with evidence addressing the defendant's claimed lack of causation.'" <u>Id.</u> (citations omitted).  If the plaintiff fails to meet that burden, "the [d]efendant is entitled to summary judgment." <u>Id.</u> (citations omitted).

## III.   DISCUSSION

Not every personal injury action raises triable issues of material fact and, as the New York Court of Appeals has observed, "failure to grant summary judgment even where the evidence justifies dismissal[] burdens court dockets and impedes the resolution of legitimate claims." <u>Pommells</u>, 4 N.Y.3d at 571-72.  This case is one where the lack of any triable issue justifies dismissal.  There is insufficient record evidence from which a rational trier of fact could conclude that plaintiff's alleged injuries were proximately caused by the September 5, 2011 accident or that they constitute "serious injury" as defined by New York's No-Fault Law.

### A.    <u>Proximate Causation</u>

#### 1.    <u>Defendants' Evidence</u>

Defendants have submitted extensive and unrebutted evidence that plaintiff sustained a series of injuries prior to the September 5, 2011 accident.  The record shows that, prior to the September 5, 2011 accident, plaintiff had been involved in several workplace and motor vehicle accidents and sustained injuries to her head, shoulders, knees, neck, and back—injuries of the kind alleged in this action.  In particular, there is extensive evidence that plaintiff sustained severe and

permanent injuries in the 2005 accident.  Plaintiff specifically complained of

"headaches," "pain in the neck radiating to bilateral shoulders," and "persisting

middle and lower back pain" after the 2005 accident.  (ECF No. 119 Ex. I at 1.)

Bentsianov opined in 2006 that plaintiff had "received a severe trauma to her head,

cervical and lumbar spines, right and left shoulders" and that "injuries of this

nature and the body's responses to them can go on for years."  (ECF No. 119 Ex. J at

5.)  He also found that there were "extremes of joint movement with concomitant

over-stretching and tearing of the supporting structures of the cervical and lumbar

spines" and concluded that plaintiff had sustained a "permanent, partial

impairment."  (Id. at 5-6.)  There is no evidence in the record differentiating these

preexisting injuries from any new injury sustained on September 5, 2011.

On June 11, 2014, defendants' expert—Dr. George V. DiGiacinto

("DiGiacinto")—conducted an independent medical examination of plaintiff.

DiGiacinto inquired about plaintiff's complaints and reviewed various records,

including medical records of plaintiff's prior injuries and records from the New York

City Police Department.  (See ECF No. 119 Ex. R.)  He also reviewed MRI scans of

plaintiff's lumbar and cervical spines taken after the September 5, 2011 accident.

In a sworn report dated June 24, 2014, DiGiacinto reached the following conclusion:

> [Watson-Tobah's] examination is positive only for subjective
> complaints.  There is no objective evidence of any neurological
> abnormality.
>
> MRI studies of the cervical and lumbar spine taken shortly after the
> alleged injury of 9/5/11 demonstrate only chronic changes which clearly
> predated her injury.

> I cannot indicate that there is any significant contribution of her current neurological status and complaints to the motor vehicle accident of September 5, 2011.

(ECF No. 119 Ex. R at 5-6.)  DiGiacinto affirmed his conclusion in subsequent reports dated July 22, 2014 and September 15, 2014.[16]  DiGiacinto's conclusion that MRI studies of plaintiff's cervical and lumbar spines demonstrated "only chronic changes which clearly predated her injury" is consistent with plaintiff's own deposition testimony that, even prior to the September 5, 2011 accident, she experienced back pain when "it rain[ed] or something like that" (Watson-Tobah Dep. 47:4-7) and neck pain "on and off, on and off" (id. 48:11-15).

DiGiacinto's reports, coupled with evidence of plaintiff's accidents and injuries prior to the September 5, 2011 accident, are persuasive evidence that plaintiff's alleged injuries are preexisting.

> 2.   Plaintiff's Evidence

Plaintiff has failed to offer specific and admissible evidence from which a reasonable juror could return a verdict in her favor. See Anderson, 477 U.S. at 256. In particular, there is insufficient evidence in the record to raise a triable issue of proximate causation.

The law is clear that a conclusory expert opinion as to causation is insufficient to defeat a motion for summary judgment. See Carter, 29 A.D.3d at 344

---

[16] Plaintiff argues that DiGiacinto's reports are insufficient to make "a prima facie showing that the plaintiff's present condition was not caused by the September 5, 2011 accident." (Pl.'s Opp. at 6.) Specifically, plaintiff argues that "DiGiacinto's 'Conclusions' are markedly inconsistent with his physical examination findings." (Id. at 3.)  The Court need not resolve whether DiGiacinto's reports alone would suffice to discharge defendants' burden on summary judgment.  Rather, the Court finds that the evidence of plaintiff's prior accidents and injuries, coupled with DiGiacinto's reports and the lack of any competent medical evidence of proximate causation (as further explained below), entitles defendants to summary judgment.

("[I]n the absence of an explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's 'conclusion that plaintiff's condition is causally related to the subject accident is mere speculation' insufficient to support a finding that such a causal link exists." (citation omitted)); Pommells, 4 N.Y.3d at 572-75 (affirming a grant of summary judgment to defendants where, inter alia, "[p]laintiff's submission left wholly unanswered the question whether the claimed symptoms diagnosed by [his orthopedist] were caused by the accident," id. at 575 (citations omitted), or, alternatively, by a preexisting kidney disorder); Montgomery v. Pena, 19 A.D.3d 288, 288-89 (N.Y. App. Div. 2005) (reversing a denial of summary judgment to the defendants after finding that the "affirmed report of plaintiff's physician failed to give any objective basis for concluding that plaintiff's alleged limitations resulted from accident at issue, rather than from prior knee injury, prior back injury, or from preexisting degenerative conditions of knee and shoulder that were identified by defendants' radiologist"); Agard v. Bryant, 805 N.Y.S.2d 348, 348-49 (N.Y. App. Div. 2005) (similar); Spanos v. Fanto, 63 A.D.3d 1665, 1665-66 (N.Y. App. Div. 2009) (similar).

In ruling on defendants' motions in limine, Court precluded Kaisman and plaintiff's treating physicians from testifying as to causation because their opinions in that regard were wholly conclusory and not grounded in any differential or other scientific analysis ruling out other potential causes of plaintiff's injuries, such as plaintiff's prior car accidents or the physical altercations in which plaintiff was

involved as a police officer.  Indeed, the medical reports do not contain any

causation analysis at all.  Kaisman's reports do not mention any of plaintiff's prior

accidents and workplace altercations, much less scientifically eliminate them as

causal factors of the injuries to plaintiff's spine.  Abramov's "initial physiatric

evaluation" mentions (only) the 2005 accident, but does not contain any analysis

assessing whether the 2005 accident could have caused plaintiff's injuries.

Khakhar's report does not even include a causation opinion.

    Plaintiff's inability to present any competent medical evidence supporting her

allegation that her injuries were proximately caused by the September 5, 2011

accident entitles defendants to summary judgment.  See Carter, 29 A.D.3d at 344

("In order to recover damages for noneconomic loss related to a personal injury

allegedly sustained in a motor vehicle accident, a plaintiff is required to present

competent, nonconclusory expert evidence sufficient to support a finding . . . that

the injury was proximately caused by the accident at issue." (emphasis added)

(citations omitted)).  Plaintiff's self-serving testimony in her affidavit (submitted for

the first time in opposition to defendants' motion for summary judgment) is

insufficient as a matter of law to raise a triable issue of proximate causation.  See

id. at 344-45 ("Plaintiff's own self-serving and conclusory testimony" regarding

causation is, "in the absence of corroborating objective medical evidence, insufficient

to raise a triable issue for submission to the jury." (citations omitted)); Rhone v.

United States, No. 04 Civ. 5037(PKL), 2007 WL 3340836, at *9 (S.D.N.Y. Nov. 9,

2007) ("Courts have made clear . . . that a plaintiff's own self-serving statements are insufficient to raise a triable issue of fact." (citations omitted)).[17]

Courts applying New York law repeatedly have entered summary judgment in favor of defendants in personal injury actions where there was a lack of nonconclusory medical testimony establishing proximate causation.

In Manzi v. Davey Tree Expert Co., the plaintiff alleged that a defendant collided into his vehicle and caused him to sustain "serious injuries" within the meaning of New York's No-Fault Law. 977 F. Supp. 2d 150, 152 (E.D.N.Y. 2013). The district court granted summary judgment to the defendants. As to the alleged injury to plaintiff's right knee, the court found that plaintiff's evidence was

---

[17] In her opposition, plaintiff argues that "[t]he court did allow Tobah to establish causation through her testimony." (Pl.'s Opp. at 2.) Plaintiff quotes the following statements made by the Court at the FPTC:

> But the causation, she's really going to have to establish that. And she can get on the stand and say, here's what happened: I felt like things were jarred inside of me—whatever her testimony is going to be—I went to the doctor within X period of time thereafter, and I['ve] never felt this before. And the jury will then determine her credibility. And I think she could put the pieces to together. The doctor[s'] medication examination can come in, but they can't do causation.
> . . .
> She can certainly . . . get on the witness stand and say on direct or [on] cross, I was in an accident in 2005, and I was fine. By no means am I precluding what she herself can report about her view of her own symptoms and when they arose and why they arose, right[?] She can report on that.

(Id.)

Plaintiff puts too much weight on these statements from the Court. These statements were made after the original deadline to make dispositive motions had elapsed and two months before defendants requested to make a belated motion for summary judgment based on the Court's rulings at the FPTC. The remarks were made in the context of explaining that while medical testimony is often offered and received on the issue of causation, it must be supported by some analysis; here it was not. Thus, only plaintiff could testify as to causation—if the case was otherwise allowed to proceed to trial. The Court did not in any way rule on the sufficiency of such testimony. Notably, at this time, defendants had not yet moved for summary judgment on the issue of causation. Taken in that context, the above-quoted statements simply reflected the Court's view of how plaintiff would attempt to prove proximate causation at trial—through her own testimony. Of course, even if this case had gone to trial, defendants would have had the option of seeking judgment as a matter of law based on insufficient proof of proximate causation. See Fed. R. Civ. P. 50.

insufficient to establish a causal relationship between the injury and the accident at issue. Id. at 158. Plaintiff had offered reports by two orthopedic surgeons, Drs. Bhatt and Paul, but the court found that the doctors' causation opinions were conclusory and thus inadequate to defeat summary judgment:

> Dr. Bhatt opines, in conclusory fashion, that Plaintiff's right knee injury is "causally related" to the April 30, 2010 accident, but offers no explanation or rationale for that opinion. Dr. Paul, too, simply appears to assume that the April 30, 2010 accident directly caused the right knee injury. Yet Dr. Bhatt and Dr. Paul's reports provide no indication that their findings are based on a review of Plaintiff's complete medical records, as opposed to simply parroting what Plaintiff told them as to the cause of his right-knee injury. Indeed, neither doctor explains or acknowledges the notable, if not incredible, month-long delay in the onset of Plaintiff's right knee pain. As such, Dr. Bhatt and Dr. Paul's conclusory, unsupported findings do not provide a basis to defeat Defendants' motions for summary judgment.

Id. at 158-59 (citations omitted).

In Rhone, a negligence action under the Federal Tort Claims Act governed by New York law, the plaintiff alleged that he sustained injuries when a mail delivery truck driven by a U.S. Postal Service employee collided with his vehicle. See 2007 WL 3340836, at *1, *4. The district court found that the Government had "submitted persuasive evidence that Rhone's injuries are related to a pre-existing condition," id. at *7, and that the plaintiff failed to meet his "burden of providing evidence that addresses the Government's claimed lack of causation," id. at *8. Plaintiff had submitted affirmations from several doctors (Drs. Rigney, Rothpearl, and Vlattas), but the court found that any causation opinions were conclusory and reached without regard to plaintiff's medical history:

The affirmations put forth by Rhone do not rebut the assessments from the Government experts that Rhone's injuries were caused by a degenerative condition and were evident prior to the December 2003 accident [the accident at issue]. First, Dr. Rigney submitted brief conclusory findings that do not consider causation. He makes no mention of Rhone's medical history or March 2001 accident. Second, Dr. Rothpearl also submitted brief conclusory findings that merely state that Rhone's MRIs revealed partial tears in the tendons in his shoulders. Dr. Rothpearl does not mention what might have caused the tears, nor does he mention any of Rhone's medical history. Third, in his brief findings, Dr. Vlattas does not mention whether he obtained Rhone's medical history. In spite of that, Dr. Vlattas states that "[t]he absence of any pre-existing condition make[s] clear that these injuries were as a result of the trauma sustained in the accident of December 27, 2003." In addition, Dr. Vlattas states that he felt a muscle spasm upon examination and that his finding "is consistent and compatible with [his] diagnosis of spinal nerve injury related to and caused by accident of December 27, 2003." However, without consideration of Rhone's medical history and the persuasive evidence of a degenerative condition put forth by the Government, Dr. Vlattas's conclusion is mere speculation.

Id. at *8 (citations omitted). The court also explained that "Rhone's own statements cannot serve as a substitute for objective medical evidence." Id. at *9; see also id. ("Without objective medical evidence to corroborate Rhone's self-serving statements, his own affidavit cannot overcome defendant's evidence regarding causation."). Accordingly, the court granted the Government's motion for summary judgment. Id. at *11.

In Pommells v. Perez, the New York Court of Appeals considered three car accident cases: Pommells v. Perez, Carrasco v. Mendez, and Brown v. Dunlap. In Pommells v. Perez, the court affirmed a grant of summary judgment to the defendants, finding, inter alia, that the plaintiff failed to address the effect of his preexisting kidney disorder on his alleged accident injuries. See 4 N.Y.3d at 574-75.

Plaintiff had offered a medical opinion as to causation, but the court explained that "[p]laintiff's submission left wholly unanswered the question whether the claimed symptoms . . . were caused by the accident" at issue. Id. at 575.  The court also affirmed summary judgment in defendants' favor in Carrasco v. Mendez.[18]

In Carter, the Appellate Division reversed the lower court's award of damages after a jury trial on the ground that plaintiff failed to prove serious injury causally related to the car accident at issue (the "September 10 accident").  Carter, 29 A.D.3d at 342.  Plaintiff's expert witness had testified at trial that the September 10 accident was a substantial factor in causing plaintiff's injury, but failed to "provide any explanation of how he could distinguish the left-knee injury plaintiff allegedly presented after the September 10 accident from the knee injury caused by [a prior accident]."  Id. at 344.  The Appellate Division explained that

> in the absence of an explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's "conclusion that plaintiff's condition is causally related to the subject accident is mere speculation" insufficient to support a finding that such a causal link exists.

---

[18] In the third case—Brown v. Dunlap—the court concluded that summary judgment in favor of the defendants was inappropriate.  Watson-Tobah's reliance on Brown as support is misplaced, however. Unlike the record in this case, the record in Brown lacked persuasive evidence of prior injuries. Indeed, two of the defendants' doctors in Brown acknowledged that the plaintiff's injuries were caused by the accident at issue.  See 4 N.Y.3d at 576 ("According to defendants' medical evidence, any limitations plaintiff suffered as a result of the accident were minor at best.  However, those injuries that existed, according to Dr. Frank and Dr. Baruch, were causally related to the car accident.  Only defendants' radiologist, Dr. Berkowitz, noted—without more—that the '[d]isc desiccation and minimal diffuse disc bulge' were 'chronic and degenerative in origin.'" (emphasis added)); see also id. at 578 ("As opposed to the undisputed proof of plaintiff's contemporaneous, causally relevant kidney condition in Pommells, here even two of defendants' other doctors acknowledged that plaintiff's (relatively minor) injuries were caused by the car accident.").

Id. (citation omitted).  The Carter Court also found that "[p]laintiff's own self-serving and conclusory testimony that he did not injure his knee until September 10, in addition to being incredible . . . was, in the absence of corroborating objective medical evidence, insufficient to raise a triable issue for submission to the jury." Id. at 344-45 (citations omitted).  Finally, the Court observed that defendants' medical expert "testified that plaintiff's injury could not have been caused by the September 10 accident, since that accident (in which the cab in which plaintiff was riding rear-ended another car, without damage to either vehicle) did not generate sufficient force to cause such an injury." Id. at 345; see also Andre v. Seem, 234 A.D.2d 325, 325 (N.Y. App. Div. 1996) (reversing the judgment of the lower court after a jury trial on the ground that the testimony of the plaintiff's expert was insufficient to establish a prima facie case of causation).

B.   Serious Injury

Plaintiff alleges that she sustained a "significant limitation of use of a body function or system" and a "permanent loss of use of a body organ, member, function or system" as a result of the September 5, 2011 accident.  (Pl.'s Opp. at 9.)  Plaintiff also occasionally refers to the "permanent consequential limitation of use of a body organ or member" category of "serious injury" in her opposition brief.  (See, e.g., id. at 10.)  Plaintiff relies on Kaisman's initial evaluation and narrative report as support for her claim of serious injury.  (See Pl.'s Opp. at 9-11.)

The Court finds that there is insufficient record evidence for any rational juror to conclude that plaintiff sustained any kind of serious injury in the September 5, 2011 accident.  To start, the lack of a nonconclusory medical opinion

as to causation renders irrelevant Kaisman's diagnosis of a "permanent disability" to plaintiff's lumbar spine[19] and any other injuries documented in plaintiff's medical records.  Where there is no competent medical evidence linking the diagnosis to the accident at issue (and scientifically eliminating other causes), the diagnosis, no matter how harsh, cannot defeat summary judgment.  See Ruffin, 2013 WL 4834368, at *12 ("Given that Dr. Diaz did not examine plaintiff until six months after the accident and that there is no other corroborative evidence indicating a causal connection between the accident and the restrictions in plaintiff's range of motion, we find that Dr. Diaz's report 'impermissibly invites speculation as to causation' of plaintiff's restricted range of motion." (quoting Griffiths v. Munoz, 950 N.Y.S.2d 787, 790 (N.Y. App. Div. 2012))).

Even if the doctors' causation opinions were not deficient, there is insufficient record evidence of "serious injury" relating to the September 5, 2011 accident. Defendants have established a prima facie case of a lack of "serious injury" through the sworn report of DiGiacinto, who conducted an independent medical examination of plaintiff and concluded that the examination was "positive only for subjective complaints" and that there was "no objective evidence of any neurological abnormality." (ECF No. 119 Ex. R at 5.)  See Tuna, 819 N.Y.S.2d at 615 (explaining that "plaintiff's subjective complaints of pain do not qualify as a serious injury within the meaning of Insurance Law § 5102(d)" (citations omitted)).

The burden thus shifts to plaintiff to establish that she sustained a serious injury.  The medical reports plaintiff has produced are insufficient to meet that

---

[19] Kaisman's reports do not discuss any injuries other than those to the lumbar spine.

burden.  Abramov's impression was that plaintiff had injuries to the cervical spine, lumbar spine, left shoulder, and right knee, as well as frontal headaches, anxiety, nervousness, and sleep disturbance.  However, his report neither describes these injuries nor characterizes their severity.  There is no indication in the report, for example, that plaintiff suffered a "significant limitation of use" of her cervical spine or a "permanent loss of use" of her left shoulder.[20]

Kaisman concluded that plaintiff has a permanent disability to her lumbar spine based on the results of two MRIs and various range-of-motion tests.  This, too, is insufficient to meet plaintiff's burden to show a "serious injury."  The MRIs showed that plaintiff had bulging and herniated discs, which "are not, in and of themselves, evidence of serious injury without competent objective evidence of the limitations and duration of the disc injury."  DeJesus, 61 A.D.3d at 608 (citations omitted).  Moreover, while Kaisman's reports noted that plaintiff exhibited restricted ranges of motion, there is no indication as to the methodology used to calculate the degrees of restriction and whether the tests conducted were passive or active range-of-motion tests.  The reports thus are insufficient to overcome defendants' prima facie showing of the absence of a serious injury.  See McCreesh v. Hoehn, 307 A.D.2d 638, 638 (N.Y. App. Div. 2003) (affirming a grant of summary judgment to the defendant where, inter alia, a chiropractor's opinion that the "plaintiff suffered a 50% 'permanent degree of loss of use and function in his cervical spine'" was "unsupported by any mention of the objective tests performed or

---

[20] Abramov's "follow up physiatric evaluation" states that "[t]he patient is working with partial disability."  However, that report does not even contain an opinion as to causation, much less ground any such opinion in scientific analysis.  Khakhar's report similarly lacks a causation opinion.

their objective results utilized in diagnosing plaintiff's condition" (citations omitted)); <u>Mitchell v. Kowalski</u>, 708 N.Y.S.2d 437, 438 (N.Y. App. Div. 2000) (affirming the lower court's grant of judgment in favor of the defendant where "[t]he only medical testimony offered at trial was that of a chiropractor" and "[a]lthough the chiropractor testified to the degree of limitation in range of motion of the plaintiff's neck, he did not testify to the objective tests used to arrive at his conclusions" (citations omitted)).[21]  Finally, there is no evidence in the record that plaintiff suffered a "total" loss of the use of any body part or bodily function, as required to show a "permanent loss of use" of a body member or system.  <u>See</u> <u>Oberly</u>, 751 N.E.2d at 458.

## IV.   CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 94, 98, 100, 104, and 109 as moot and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            December 5, 2014

_____
KATHERINE B. FORREST
United States District Judge

---

[21] Plaintiff's claim of a "serious injury" is also undermined by the two-year gap in her treatment between November 2011 and November 2013.  <u>See</u> <u>Pommells</u>, 4 N.Y.3d at 574 ("While a cessation of treatment is not dispositive—the law surely does not require a record of needless treatment in order to survive summary judgment—a plaintiff who terminates therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so.").